JOAN BERNARD ARMSTRONG, Chief Judge.
 

 |T STATEMENT OF THE CASE
 

 On June 26, 2007, the defendant, Louis M. Taylor, a.k.a. “Tubby”, (Taylor), and his co-defendant, Craig Smith (“Smith”), were charged by bill of information with attempted second degree murder of Nathaniel Davis. On July 11, 2007, the defendant pled not guilty.
 

 On June 23, 2008, the trial court heard and denied the defendant’s motion to suppress identification and found probable cause. On July 25, 2008, the defendant filed a Motion Pursuant to La.C.Cr.P. art. 704 for Separate Trials of Defendants. The record contains nothing more on this motion than the actual document.
 

 On July 31, 2008, following a trial by jury, the defendant was found guilty as charged. On that date, the defense filed a written objection to a non-unanimous jury verdict, challenging the constitutionality of La.C.Cr.P. art. 782(A). On October 29, 2008, the defendant was sentenced to twenty five-years at hard labor, and the defense objected. This appeal follows.
 

 | .STATEMENT OF THE FACTS
 

 Testimony of Officer Cindy L. Woods
 

 Officer Cindy L. Woods testified that she is a supervisor for the New Orleans Police Department, Communications Division’s 911 Center. She identified a printout and a cassette tape of the April 27, 2007 911 call that the State introduced into evidence. The tape was played for the jury-
 

 Testimony of Dr. Juan Duchesne
 

 Dr. Juan Duchesne testified that he is a trauma surgeon at University Hospital. He said he was on call on April 27, 2007, when he saw Nathaniel Daws (“Mr. Davis”), the victim. According to Dr. Du-chesne, Mr. Davis suffered multiple gunshot wounds. Mr. Davis was in shock due to blood loss when he arrived. He suffered injuries to his left lung, his abdomen and his bowel. He also had “other inference of bullets in his extremities” and a small laceration to his head. Dr. Du-chesne testified that Mr. Davis was chemically paralyzed for roughly twenty-four hours after his admission to the hospital as part of his treatment. He stated that Mr. Davis remained in intensive care for two days and remained on the hospital floor for part of two or three days. Part of his treatment included a prescription for morphine.
 

 Testimony of Officer Leroy Matthews
 

 Officer Leroy Matthews testified that he was assigned to the New Orleans Police Department’s Fifth District on April 27, 2007. On that date, he responded to a call near the intersection of Franklin Avenue and North Galvez Street at approximately 12:05 p.m. He arrived at the scene to find the victim, Mr. Davis, on the curb, bleeding from the head, the stomach, and on his face. Duct tape was on |3his left hand and around his neck. Officer Matthews said that Mr. Davis explained that two unknown black males had kidnapped him, beat him with a pipe, and shot him in an abandoned building. The abandoned building was at 2550 N. Galvez Street. Officer Matthews stated that Detective
 
 *423
 
 Cyril Evans arrived at the scene one or two minutes after Officer Matthews and assumed the investigation.
 

 Testimony of Detective Cyril Evans
 

 Det. Evans testified that upon interviewing the victim, Mr. Nathaniel Davis, he learned that the perpetrators were Craig, “Tubby”, and a third unknown individual. He noted that the crime scene — 2550 N. Galvez Street — is a block from where the victim was found. Subsequent investigation revealed that Mr. Davis lived at 2224 N. Galvez Street.
 

 Det. Evans testified that during the initial investigation a black Camaro was found in the 2000 block of Painters Street. He stated that he learned from Mr. Davis that the car belonged to Craig Smith and that Smith lived in the residence where it was parked. Det. Evans described the residence as adjoining to the crime scene. He further testified that a motion inquiry through the district’s computer system showed that Smith lived at 2025 Painters Street, where the Camaro had been discovered.
 

 Det. Evans stated that he interviewed Mr. Davis on April 29, 2007. In that interview, Mr. Davis provided a description of the third, unknown assailant. Det. Evans testified that Mr. Davis identified one of the men as “Tubby” and provided information that “Tubby” lived in the 1900 block of Painters Street. Mr. Davis also identified Smith in a photographic lineup.
 

 |4Pet. Evans stated that on May 1, 2007, a search warrant was executed at Smith’s residence. Smith was arrested at that time. Det. Evans testified that as he drove away from 2025 Painters Street, he passed a white Camaro parking in the driveway 1931 Painters Street. At that time, he recalled that Mr. Davis had informed him that “Tubby” drove a white Camaro and lived in the 1900 block of Painters. Det. Evans saw the driver of the white Camaro exit and proceed to unload groceries. He called for assistance and parked. Before assistance could arrive, however, the driver got back into the white Camaro and drove North on Painters Street, back towards the 2000 block. At that point, assistance arrived and a traffic stop was executed on the white Camaro near the corner of Arts and Johnson Streets. When stopped, the driver of the white Camaro identified himself as Louis Taylor. Upon being asked, Taylor also informed that his nickname is “Tubby”. Det. Evans also observed Taylor had a tattoo that said, “Tubby”.
 

 Det. Evans testified that Taylor was arrested and taken to the Fifth District station. A photographic lineup was compiled and taken to University Hospital to show Mr. Davis. At the hospital, Mr. Davis identified the defendant, out of the lineup as the “Tubby” who had attacked him. Det. Evans testified that he then returned to the Fifth District station, advised the defendant Taylor of the charges against him, and processed the arrest paper work for both Smith and the defendant.
 

 Det. Evans testified that blood samples, two cell phones and a bloody roll of duct tape were recovered from the crime scene. A pair of tennis shoes, a white blood stained t-shirt, a white undershirt, a pair of blue jeans, a navy blue belt, keys and another piece of duct tape were also recovered from the crime scene.
 

 Det. Evans further testified that at the time that the search warrant was executed at Smith’s residence, Walter Jones, a man fitting Mr. Davis’ description | ¡¡of the third assailant, was detained. However, Mr. Davis was unable to identify Mr. Jones in a lineup, and Mr. Jones was released.
 

 Testimony of Mr. Nathaniel Davis
 

 Mr. Nathaniel Davis, the victim, testified that he had known both Smith and the
 
 *424
 
 defendant for approximately seven or eight months. He grew up with their cousin, “Tank”. After “the storm”, Mr. Davis relocated to N. Galvez Street, near Elysian Fields Avenue. He said that Smith and the defendant lived near the corner of N. Galvez and Painters Streets, and the three began to “hang out.” Smith once cut Mr. Davis’ hair, and the defendant had taken Mr. Davis to the store for supplies.
 

 Mr. Davis testified that prior to the April, 27, 2007 incident, he went to see Smith “on a Wednesday” to inquire about Tank, who had been shot. Smith acted “nonchalant” and did not want to speak to Mr. Davis. Mr. Davis returned home. Mr. Davis stated that he returned to see Smith the next day and inquired as to what hospital Tank was in so that he might visit. He claimed that Smith was “nonchalant” again.
 

 Mr. Davis said he returned on a Friday. Craig Smith was with another man as Mr. Davis approached. Mr. Davis stated that when he inquired about Tank, Smith was non-responsive. As Mr. Davis left, Smith grabbed him behind the neck and put him in a choke hold. At some point during this encounter, Smith made a phone call, instructing the person to come over. According to Mr. Davis, the defendant arrived in a white Camaro. Mr. Davis stated that he freed himself from Smith, however, Smith and the defendant then pushed him under a nearby shed. As they did so, they accused Mr. Davis of being involved in Tank’s shooting. Mr. Davis testified that Smith and the defendant then grabbed sticks and pipes, and the | f,defendant and the “other dude” proceeded to beat him with them. According to Mr. Davis, Smith ran off upstairs. He returned with a gun. Mr. Davis testified that Smith pointed the gun at him, and he went at Smith. Smith shot Mr. Davis three times. The assailants then got some duet tape and attempted to tape Mr. Davis’s hands and mouth. Mr. Davis testified that he managed to free his hands and remove the tape from his mouth. The assailants hit Mr. Davis with the sticks and pipes, yelling at him to shut up. They then took Mr. Davis into a house, where they put duct tape on him again and continued beating him.
 

 Mr. Davis testified that Smith threw the gun down and the “other ‘lil dude’ picked it up and began hitting him with it. Mr. Davis said that Smith attempted to call someone on his phone and got angry because whomever he was calling was not answering. The defendant, Taylor, then left with the third man to get some gas to set the house on fire, leaving Mr. Davis alone with Smith. Mr. Davis said he then managed to flee from Smith. He ran to the middle of the intersection of Franklin Avenue and North Galvez Street, where he attempted to flag someone down for help. A woman came to his rescue. More people gathered and called the police.
 

 When Det. Evans arrived, Mr. Davis told him that his attackers were “Tubby and Craig.” He also testified that the incident occurred nearby in an abandoned house and told Det. Evans where “Craig” and “Tubby” lived. Several days later, Det. Evans visited Mr. Davis at the hospital, and he identified the defendant and Smith in photographic lineups.
 

 WTiile Mr. Davis was in the hospital, he stated that Tank was placed in the same room as he. WTien Tank asked why Mr. Davis was there, Mr. Davis told |7Tank what had happened. Mr. Davis testified that Tank said, “Man, I told them dudes that wasn’t you.”
 

 ERRORS PATENT
 

 A review of the record for errors patent reveals none.
 

 
 *425
 

 DISCUSSION
 

 ASSIGNMENT OF ERROR NUMBER 1
 

 In his first assignment of error, the defendant argues that La. C.Cr.P. art. 782(A), allowing for a conviction by a ten to two (i.e. non-unanimous) jury vote in a non-capitol felony case, is unconstitutional in violation of the Sixth Amendment of the U.S. Constitution. It is noteworthy that the record on appeal does not indicate the jury was polled, nor does the record show the actual jury vote. The defendant asserts that the jury returned a verdict with a ten to two vote.
 
 [1]
 
 The State does not challenge this assertion. Presuming the defendant’s assertion that he was convicted by a ten to two jury vote is correct, this assignment of error merits no relief as a matter of law.
 

 In
 
 State v. Tillman,
 
 2008-0408, p. 27 (La.App. 4 Cir. 3/4/09), 7 So.3d 65, this Court recognized that the First Circuit addressed this issue in 2007 in the case of Derrick Todd Lee. The First Circuit stated the following on this issue:
 

 The punishment for second degree murder is confinement for life at hard labor.
 
 See
 
 LSA-R.S. 14:30.1(B). Louisiana Constitution Article I, § 17(A) and LSA-C.Cr.P. art. 782(A) provide that in cases where punishment is necessarily at hard labor, the case shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a |sverdict. Under both state and federal jurisprudence, a criminal conviction by a less than [ — ] unanimous jury does not violate a defendant’s right to trial by jury specified by the Sixth Amendment and made applicable to the states by the Fourteenth Amendment.
 
 See Apodaca v. Oregon,
 
 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972);
 
 State v. Belgard,
 
 410 So.2d 720, 726 (La.1982);
 
 State v. Shanks,
 
 97-1885, pp. 15-16 (La.App. 1 Cir. 6/29/98), 715 So.2d 157, 164-165. The defendants reliance on
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002),
 
 Apprendi v. New Jersey,
 
 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and
 
 Jones v. United States,
 
 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), is misplaced. These Supreme Court decisions do not address the issue of the constitutionality of a non-unanimous jury verdict but rather, address the issue of whether the assessment of facts in determining an increased penalty of a crime beyond the prescribed statutory maximum is within the province of the jury or the sentencing judge. These decisions stand for the position that any fact (other than a prior conviction) that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and approved beyond a reasonable doubt.
 
 See Apprendi,
 
 530 U.S. at 490, 120 S.Ct. at 2362-63. Nothing in these decisions suggests that a jury’s verdict must be unanimous. Accordingly, LSA-Const. Art. I § 17(A) and LSA-C.Cr.P. art. 782(A) are not unconstitutional and do not violate the defendant’s Sixth Amendment right to a trial by jury.
 

 State v. Lee,
 
 2005-0456, p. 4 (La.App. 1 Cir. 5/16/07), 964 So.2d 967, 973,
 
 cert, denied State v. Lee,
 
 2007-1288 (La.3/7/09), 977 So.2d 896,
 
 writ denied Lee v. Louisiana,
 
 — U.S. —, 129 S.Ct. 130, 172 L.Ed.2d 37 (2008).
 

 In
 
 Tillman,
 
 this Court also noted that the U.S. Supreme Court denied a writ in
 
 Lee
 
 on October 6, 2008. 2008-0408 at p. 26, 7 So.3d 65,
 
 citing
 
 — U.S. —, 129 S.Ct. 130, 172 L.Ed.2d 37 (2008). Just weeks after this Court decided
 
 Tillman,
 
 the Louisiana Supreme Court reversed a
 
 *426
 
 trial court ruling that held La.C.Cr.P. art. 782 unconstitutional.
 
 State v. Bertrand,
 
 2008-2215, 2008-2311 (La.3/17/09), 6 So.3d 738. In doing so, the Court concluded:
 

 Due to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court’s still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be |9overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.
 

 2008-2215, 2008-23111 at p. 8, 6 So.3d at 743. This recent jurisprudence clarifies that La.C.Cr.P. art. 782(A)’s presumption of constitutionality remains intact. Therefore, we find that the non-unanimous verdict did not violate the defendant’s rights under the United States or Louisiana constitutions.
 

 ASSIGNMENT OF ERROR NUMBER 2
 

 In his second assignment of error, the defendant asserts that the trial court erred in trying the defendants together because his defenses were antagonistic to Smith’s defense. He argues that Mr. Davis, the victim, was attacked by Smith after asking too many questions about Tank’s condition, but that Mr. Davis never mentioned a disagreement with the defendant. He points to no other evidence. In his pre-trial motion, filed three days prior to trial, the defendant asserted that his defense would argue that Smith was, in fact, the guilty party. A review of the trial transcript fails to show such an argument. Moreover, neither the defendant nor his co-defendant, Craig Smith, called any witnesses.
 

 The trial court never addressed the defendant’s motion, which was not filed until three days prior to trial. However, the trial transcript shows no objection lodged by the defense to offer the trial court a chance to address the motion. Accordingly, this argument has arguably been waived.
 
 See State v. Williams,
 
 341 So.2d 370, 378 (1976) (an error cannot be availed of on appeal if the party has not made known to the court the action which he wishes the court to take),
 
 citing
 
 La.C.Cr.P. art. 841. The defendant’s failure to make or preserve a record showing he | inobjected to going to trial without addressing his motion shows that he may have changed his mind about wanting a separate trial. This would be legitimate trial strategy. The logical conclusions can only be one of the following: 1) the trial court inherently denied the motion; or 2) the defendant decided to drop the issue and did not preserve it for review. Regardless of what happened below, substantive analysis shows that this assignment of error, as argued, merits no relief.
 

 This Court has stated the following on severance:
 

 La.C.Cr.P. article 704 provides that “[jjointly indicted defendants shall be tried jointly unless ... [t]he state elects to try them separately; or ... [t]he court, on motion of the defendants, and after contradictory motion with the district attorney, is satisfied that justice requires a severance.”
 

 Whether to grant or deny a severance is within the trial court’s sound discretion and will not be disturbed absent clear abuse.
 
 State v. Prudholm,
 
 446 So.2d 729, 741 (La.1984). The standard for a pre-trial severance is broader because of speculation as to what the evidence will be, whereas the standard for severance
 
 *427
 
 after trial commences is stricter because the judge can examine the evidence.
 
 State v. Fleming,
 
 574 So.2d 486, 492 (La.App. 4th Cir.1991),
 
 writ denied,
 
 592 So.2d 1313 (La.1992). Under the “antagonistic defenses” test a severance is mandated when each defendant intends to blame the other, and a joint trial would require the defendants to defend against the state and each other.
 
 State v. Prudholm,
 
 446 So.2d at 741;
 
 See
 
 La. C.Cr.P. art. 704, comment (c).
 

 When each confession or statement involves both defendants as principals and only the extent of participation is contradictory, the defenses are not antagonistic and the degree of blame each defendant seeks to cast on the other does not warrant a severance.
 
 State v. Williams,
 
 416 So.2d 914, 916 (La.1982);
 
 State v. Simmons,
 
 381 So.2d 803, 806 (La.1980), cert
 
 denied, Simmons v. Louisiana,
 
 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 498 (1980).
 

 In
 
 State v. Simmons, supra,
 
 the jointly charged defendants were convicted of first degree murder. The Supreme Court held that although each defendant’s statement blamed the other for the shooting, the defenses were not antagonistic because each confession involved the other defendant as a principal. See also
 
 State v. Gaskin,
 
 412 So.2d 1007, 1012 (La.1982), where the Court stated in dicta that “(j)ustice does not require a severance where only the extent of participation of each defendant is at issue.” A principal is defined as one who is 11/‘concerned in the commission of a crime, whether present or absent, and whether [he] ... directly commit[s] the act constituting the offense, aid[s] and abet[s] in its commission, or directly or indirectly counsels] or procure[s] another to commit the crime.” La. R.S. 14:24.
 

 State v. August,
 
 96-2777, pp. 8-9 (La.App. 4 Cir. 9/16/98), 719 So.2d 536, 541. Moreover, the mere unsupported allegation that defenses will be antagonistic is not sufficient to require severance.
 
 State v. Prudholm,
 
 446 So.2d 729, 740 (La.1984);
 
 see also, State v. Bradford,
 
 367 So.2d 745 (La. 1978)(the mere allegation that a defendant will attempt to cast blame on a codefen-dant does not suffice).
 

 Here, the defendant points to the dispute between the victim and his co-defendant. At the trial level, he also asserted that he intended to inculpate his co-defendant. However, he points to no arguments made at trial that demonstrated any antagonism between Smith’s defense and his. Review of the trial transcript reveals none. Nowhere does the trial transcript show that Smith and the defendant blamed each other. The dispute between Smith and Mr. Davis does not, per se, show any antagonism between Smith’s and the defendant’s defenses. Even if it did, this per se demonstration would not be sufficient, under the case law above, for the defendant to bear his burden of showing that severance was mandated. Moreover, the defendant’s statement that Mr. Davis mentioned no disagreement with him fails on two levels. First, the alleged difference that Mr. Davis had a prior altercation with Smith but did not have one with the defendant does nothing, on its own, to show antagonistic defenses between the two defendants. Second, the assertion appears incredible, given Mr. Davis’s testimony that showed the defendant participated with great effect in the attack on him. The jurisprudence shows that varying degrees of participation in a crime does not make a co-defendant’s defenses antagonistic.
 
 See August,
 
 96-2777, at p. 9, 719 So.2d at 541,
 
 \l2citing State v. Simmons,
 
 381 So.2d at 806. The record is simply void of antagonistic defenses between the defendant and the co-defendant,
 
 *428
 
 Smith. Accordingly, this assignment of error lacks merit.
 

 For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
 

 AFFIRMED.
 

 [1]
 

 . He does not assert that less than ten jurors voted to find him guilty.